**Opinion issued June 13, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00096-CR

———————————

**RENE BARAHONA-RAMOS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1762748**

---

## MEMORANDUM OPINION

A jury found Appellant Rene Barahona-Ramos guilty of the first-degree felony offense of aggravated sexual assault of a child younger than six years old and the trial court assessed his punishment at twenty-five years' confinement. Barahona-Ramos argues the trial court erred by preventing him from cross-examining the

outcry witness about a prior allegation of abuse made by the complainant against her brother.

We affirm the trial court's judgment.

## Background

The State charged Appellant Rene Barahona-Ramos by indictment with the first-degree felony offense of aggravated sexual assault of a child younger than six years of age. The indictment alleged that "on or about February 1, 2018," Barahona-Ramos "unlawfully, intentionally and knowingly cause[d] the penetration of the sexual organ of [Nancy], a child younger than six years of age" with his finger. Barahona-Ramos pleaded "not guilty," and the case proceeded to a jury trial.[1]

## A. The Outcry Witness

The trial court conducted an Article 38.072 hearing outside the presence of the jury. At the conclusion of the hearing, the trial court held that the complainant's mother, Sarah, could testify as an outcry witness.[2] Sarah testified at trial that she

---

[1] We use pseudonyms in this opinion when referring to the complainant, her mother, and her brother to protect the identity of the complainant, who was a minor when the assault occurred. *See* TEX. CONST. art. I, § 30(a)(1); TEX. R. APP. P. 9.10(a)(3).

[2] "When a defendant is charged with certain offenses against a child under the age of 14 . . . Article 38.072 [of the Texas Code of Criminal Procedure] allows into evidence [a] complainant's out-of-court statement so long as that statement is a description of the offense and is offered into evidence by the first adult the complainant told of the offense. Though the terms do not appear in the statute, the victim's out-of-court statement is commonly known as an 'outcry,' and an adult who testifies about the outcry is commonly known as an 'outcry witness.'" *See*

met Barahona-Ramos in 2014 and they began dating. About six months later, Barahona-Ramos moved in with Sarah and her children Nancy, Nancy's twin sister Lisa, and Nancy's older brothers Jack and Bobby.[3] Nancy and Lisa were about one year old when Barahona-Ramos moved in. They believed that Barahona-Ramos was their biological father and they called him "Papi."

Sarah worked every other weekend as a translator at a hospital. On February 23, 2018, Sarah was working, and Barahona-Ramos was at home alone with the children. Barahona-Ramos called Sarah at work through a video call. According to Sarah, Barahona-Ramos, Nancy, and her twin sister were in bed together. While Sarah found that odd, she did not think much of it. During the video call, Nancy told Sarah that "Papi did like this to my foo-foo" and she stuck out her tongue. The call suddenly dropped. Sarah thought the phone call was "awkward," but she did not follow up with Nancy or ask her questions about her statement.

The following month, on Saturday, March 10, 2018, Sarah went out with a friend and did not return home until around 4:00 a.m. on Sunday. Barahona-Ramos was angry with Sarah for staying out so late and he asked Sarah's son, Jack, to call the police to report her for leaving the children home alone. Jack was eight years

---

*Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011). The trial court must hold a hearing outside the presence of the jury to determine whether the victim's out-of-court statement is reliable, and thus admissible. *Id*. at 484–85.

[3] Sarah and Barahona-Ramos later had a child, Nancy's younger sister, Valerie.

old, Bobby was seven years old, Lisa and Nancy were five years old, and Valerie was three years old. According to Sarah, it was common for her and Barahona-Ramos to go out and leave Jack and Bobby in charge of their younger siblings. She thought it was "ridiculous" that Barahona-Ramos had her son report her to the police. Sarah denied being angry with Barahona-Ramos and testified she did not know her son had called the police until the next morning when she got home.

When Sarah arrived home at around 4:00 a.m. on Sunday, March 11, 2018, Barahona-Ramos was waiting for her outside with a machete. According to Sarah, Barahona-Ramos broke her phone, yelled at her friend, and threatened her friend and her friend's husband. Barahona-Ramos would not let Sarah into the house, so she slept in her car until her children woke up and unlocked the door.

That morning, Sarah asked Nancy and Lisa how they felt about Barahona-Ramos because she was "trying to kind of weigh the odds of staying in the relationship or not" and she thought the girls "would be more affected by the separation" than their other siblings. Sarah was contemplating ending the relationship because Barahona-Ramos had started physically abusing her that year. Lisa told Sarah that she loved Barahona-Ramos because he gave her money for popcorn and pickles. Nancy, however, yelled that she hated Barahona-Ramos because he "used his mouth on her" vaginal area, which she referred to as her "foo-foo," and he "put his fingers and was digging in her foo-foo." According to Sarah,

4

Nancy was upset and "just hyper to get her words out." Sarah, who was enraged and disgusted by Nancy's claims, grabbed a knife and confronted Barahona-Ramos who told her she was crazy. He yelled at Nancy and called her a liar. Sarah called the police later that evening because she did not want Barahona-Ramos in the home when she went to sleep that night.

When the police arrived at Sarah's house, they removed Barahona-Ramos from the home and took statements from Sarah and Nancy. Officer Ricardo Rivera with the Houston Police Department took a statement from Sarah, and he spoke to Nancy. Sarah's statement to Officer Rivera was recorded by Officer Rivera's body camera. The following day, Sarah took Nancy to Texas Children's Hospital for a sexual assault examination. Although the hospital referred Nancy to the Child Assessment Center ("CAC"), Sarah did not take Nancy to the CAC for a forensic interview until November 2018.

The record reflects that Nancy made a prior allegation of abuse against her brother Bobby in February 2017. Child Protective Services investigated the allegation, and the final disposition of the investigation was "ruled out."[4] During Sarah's testimony, defense counsel attempted to elicit testimony from her

---

[4] As the State points out in its brief, the prosecutor advised the trial court that CPS' records, which were not admitted into evidence, contained a "rule out finding[,]" which is an administrative finding to close out the case, regardless of the merits of the claim being investigated.

5

concerning Nancy's prior allegation against Bobby in 2017, as well as Sarah's statements to Officer Rivera on March 11, 2018, to establish that Sarah had doubts about Nancy's allegations of abuse against Barahona-Ramos given her allegedly false allegation against Bobby in the past.

During cross-examination, Sarah testified that she spoke to several officers the night she reported the abuse involving Barahona-Ramos, including Officer Rivera. She testified:

Defense:    Now do you remember telling -- and I think the State asked you about this -- that you kept telling [Officer Rivera] you weren't sure if this happened?

Sarah:      Yeah.

Defense:    Because at that time you weren't sure if this happened, correct?

Sarah:      I didn't want to believe it.

Defense:    Okay. Well, why else did you think it hadn't happened? Why did you say that to [Officer Rivera]?

Sarah:      Why did I say what? I'm sorry.

Defense:    I'm not sure if this happened.

At that point, the State asked to approach the bench. Outside the presence of the jury, the State argued that defense counsel's line of questioning was improper because counsel was trying to ask Sarah about Nancy's specific instances of conduct in the past "just to show that [Nancy] ha[d] made these [types of] statements before. These particular statements that we're talking about would be as to her brother

6

[Bobby] touching her bottom. . . ."[5]   According to the State, defense counsel was "just trying to offer these specific instances of conduct to impeach [Sarah] under [Texas Rule of Evidence 608] and by using [Texas Rule of Evidence] 412 and that would be inappropriate and inadmissible under the law."[6]   Defense counsel responded:

> Defense:    I'm doing it under [Texas Rule of Evidence] 613 (b). And that's that this child had made false allegations against her brother [Bobby]. And the witness [Sarah] tells [Officer Rivera], I don't know if she's lying because she made up these allegations against [Bobby] for touching her foo-foo (ph) (sic). The same thing. And in this case that I have, it says that I am allowed to cross examine her about false

---

[5]    Outside the jury's presence, the State also argued that defense counsel was attempting to question Sarah about an outcry of abuse Nancy allegedly had made against her grandmother's boyfriend.  Defense counsel, however, told the court she had no plans to ask Sarah about Nancy's outcry of abuse against her grandmother's boyfriend because "there is no evidence other than that statement that an investigation was done."  Defense counsel did not try to question Sarah about any other alleged outcries of abuse by Nancy other than the 2017 investigation involving Bobby.

[6]    Rule of Evidence 412(b) states that evidence of "specific instances of a victim's past sexual behavior" is admissible if, among other things, the evidence "relates to the victim's motive or bias."  TEX. R. EVID. 414(b)(2)(C).

Rule of Evidence 608(b) states that a witness' credibility may not be impeached with specific instances of the witness' conduct other than a criminal conviction as provided in Rule 609(a).  TEX. R. EVID. 608(b) ("Except for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness."); *see also id.* 609(a)(1) ("Evidence of a criminal conviction offered to attack a witness's character for truthfulness must be admitted if. . . the crime was a felony or involved moral turpitude, regardless of punishment").

7

allegations under 613 (b). And that's what it is. It's not under [Rule] 412 or the other rule quoted by the State.

. . .

[Sarah] testified or says to [Officer Rivera] that [Nancy] made these false accusations against [Bobby]. CPS did an investigation and found no reason to believe. That would be to the conclusion that CPS said nothing happened, it was a false allegation. Mom says to [Officer Rivera]—she made—she falsely accused or she made this up about her brother. Same allegation. That goes to bias and motive, Judge.

State:    Judge, that's actually a misrepresentation of what was actually said to the police. There was no discussion of false allegation ever. She didn't even say those words. In fact, what she said is that she's made this statement about [Bobby] touching her bottom. And she's going up in arms and she's even testified—the witness has testified that she didn't want to believe it. That's wholeheartedly different as to whether the witness or the complainant, who again hasn't even gotten on the stand to testify, has a bias or a motive to lie.

Using a transcript of the recordings taken from Officer Rivera's body camera, Barahona-Ramos' counsel read into the record a portion of Sarah's conversation with Officer Rivera.[7] Barahona-Ramos' counsel ultimately agreed with the State that her line of questioning directed at Sarah was "a little bit premature" and she planned to recall Sarah after Nancy testified.

---

[7]    As discussed later in the opinion, Barahona-Ramos' counsel read the relevant portion of the transcript into the record during his case in chief.

During his case in chief, Barahona-Ramos recalled Sarah to the stand. Outside the presence of the jury, Barahona-Ramos' counsel informed the trial court that she planned to question Sarah about the February 2017 CPS investigation involving Nancy's allegations against her brother Bobby and "about [Sarah] telling [Officer Rivera] that she did not believe—that she told the officer that night, based on that CPS investigation, she did not believe her daughter." Defense counsel argued:

> Okay. It really does go back to, Judge, [Sarah] tells Officer Rivera—and I do have verbatim what she said, that she didn't believe it happened, because her daughter had lied before. And under [*Hammer v. State*, 296 S.W.3d 555 (Tex. Crim. App. 2009)] this is a prior false allegation. So asking [Sarah] —and she didn't admit it. She said, no, I didn't doubt it. I didn't want to believe that it happened. But what [Sarah] said to [Officer Rivera] was much more than that. It wasn't, well, I don't want to believe it happened. No, [Nancy] has lied before. She made this up. I will read, for the record, exactly what [Sarah] said.

At the trial court's request, and outside the presence of the jury, defense counsel read the relevant portion of the transcript of Sarah's statement to Officer Rivera into the record. The transcript reflects that after Sarah told Officer Rivera that Nancy had made prior allegations of abuse against her brother Bobby, Officer Rivera asked Sarah, "So you were doubting? So you were doubting. Not doubting. But you were thinking maybe [Nancy] was just saying that?" Sarah responded, "Right. Thinking maybe she's just false." When Officer Rivera asked if Barahona-Ramos had tried to stop Sarah from calling 9-1-1, Sarah told Officer Rivera that Barahona-Ramos told her to call the police, but she did not call initially because

9

Nancy had "made up, you know, things of this nature before, and, you know, I mean, that's why I didn't want to."   She explained that Nancy had claimed a year before that her brother Bobby had "touched her butt" and "that's why I wanted you to question her without me influencing anything because we wanted to get your opinion." Sarah told Officer Rivera that Nancy "seems to smile and laugh a lot when it's not really—well, she'll just grin a lot like when she's answering to me these questions." Officer Rivera asked Sarah, "So you're not sure?" and Sarah responded, "I'm not, I'm not."

After defense counsel read that portion of the transcript, the trial court asked defense counsel for clarification as to what she was "trying to do" in her cross-examination of Sarah.  Defense counsel stated:

> Okay. Well, we were talking about that [Sarah] had doubts. And the State said she admitted she had doubts. No, she didn't. She said here, I didn't say that, I just told them I didn't want it to be true. When in fact that whole night she's saying she had lots of doubt. She didn't know if she believed it because of [Nancy's] false accusations to her brother.
>
> . . .
>
> Court:      And so question, ma'am. Are you trying to say that the mother made a misrepresentation? Is that what you're saying? What are you—
>
> Defense:   Well, it goes to bias, Judge, why the child may have made —like we discussed earlier, Judge
>
> Court:      So, I guess, my question first, is your issue with the mother's testimony or with the child's testimony?

10

Defense:     Part of the child's—part of the mother's testimony, because I don't believe and I don't recall her saying that [Sarah] had doubts. Because when I asked her that, she's like, no, I didn't want to believe it to be true. That's what [Sarah] said. I don't remember her saying she had any doubts. And the whole thing has been nobody doubted that this child—that this child is telling the truth, when that's not what these people—

Court:       How about maybe let's just call her in and let you ask your question and see where it goes.

Before the jury returned, Barahona-Ramos' counsel made the following proffer of evidence:

Defense:     [Sarah], was there a CPS investigation in February of 2017regarding [Nancy] and [Bobby]?

Sarah:       Yes.

Defense:     And based on that investigation did you tell Officer Rivera the night that the police came to your house that you had doubts about this allegation?

Sarah:       I never used the word doubt.

Defense:     Did you tell them you weren't sure it happened based on this [2017 CPS] investigation?

Sarah:       I told [Officer Rivera] I wanted the truth.

Defense:     Would it help you to refresh your memory if I read to you the transcript of that conversation?

Sarah:       No, thank you.

Defense:     Well, would it be possible that you said to [Officer Rivera] no, no, he told me to call 9-1-1 earlier. I just didn't because I, I—like [Nancy]'s made up, she has made up, you know, this stuff, these things of this nature before. And, you

11

know, I mean, that's why I didn't want to. To what extent? To that extent? Yes. To that extent? Yeah. Like what kind of stuff? She said her brother [Bobby] had touched her butt. Do you remember saying that?

Sarah: Not those exact words, no.

Defense: Do you remember asking that you wanted [Officer Rivera] to question [Nancy] because you weren't sure that this had happened?

Sarah: I remember asking a female if she could ask [Nancy].

Defense: Okay. But you remember asking that because you weren't sure this had happened?

Sarah: I'm not—I wasn't even there. I was not sure at that time, yes.

Defense: Did you say I still don't know, I still don't know, because I don't; I still don't know and that's all I want, I just want the truth?

Sarah: Yes.

Defense: Okay. And you wanted the truth and that was based because of the CPS investigation the year before?

Sarah: No.

Defense: That's not why you had doubts about this?

Sarah: No.

Defense: Okay. And then further on in that night when you say, it was because [Nancy] had made these allegations up before about her brother [Bobby].

Sarah: What was the question?

Defense: Okay. You say that first to [Officer Rivera], you said you don't know, right?

12

Sarah: Right.

Defense: Okay. I'm not trying to confuse you. I just looked at the wrong page. What I read to you earlier, when you said, [Nancy] had—she was at school one time and they had mentioned something about butts and this and that and she had said her brother [Bobby] had touched her butt or something. And then we went through this big ole thing, not big ole thing. So [Officer Rivera] says, so you were doubting. Not doubting. But thinking maybe she was just saying that. Right. Thinking maybe she's just false. Do you remember making those statements?

Sarah: Yes.

Defense: Okay. And those statements were based on the CPS investigation of the year before?

Sarah: My statements of agreeing with what [Officer Rivera] said?

Defense: No, no, no, your doubts.

Sarah: He just—what you just read to me said, not doubt. Can you read it again, please?

Defense: The officer says, so, you were doubting, not doubting—

Sarah: Not doubting.

Defense: Let me finish. The officer says, so you were doubting. Not doubting. But you were thinking maybe [Nancy] was just saying that. Right. You say, right, thinking maybe she's just false. So my question to you is, your doubts that night were based on the CPS investigation of the year before?

Sarah: Right.

Defense: Okay. That's all. I'm not even going to go into all of the specifics. Just those questions, Judge. Very specific. That would be it. I would pass the witness at that point.

13

On direct examination, defense counsel questioned Sarah about the February 2017 CPS investigation and she inquired whether Sarah doubted Nancy's allegation of sexual assault against Barahona-Ramos:

Defense: Was there a CPS investigation that involved [Nancy] and [Bobby]?

State: Objection; relevance.

Court: Sustained.

Defense: [Did] you have to have [Nancy] interviewed by CPS in 2017?

State: Objection; relevance.

Court: Any response?

Defense: I think it's extremely relevant to the credibility of this witness, Judge.

Court: Sustained.

Defense: Did you tell officer—or isn't it true that you told Officer Rivera that you had many doubts that night?

Sarah: No.

Defense: You don't remember telling him that you had doubts and yet you were true—

State: Objection; hearsay.

Court: Sustained.

Defense: Isn't it true that you didn't believe this happened at all?

State: Objection; relevance.

Court: Overruled.

14

Sarah:      I wanted to believe that it was not true.

Defense:    And you had doubts about this because of the CPS investigation?

State:      Objection; relevance.

Court:      Sustained.

Defense:    You were concerned about whether this had really happened; isn't that right?

Sarah:      Of course.

Defense:    Because you had reason to believe that it didn't happen?

State:      Objection; relevance and improper impeachment.

Court:      Sustained.

Defense:    I pass the witness, Judge.

## B.    Officer Ricardo Rivera

Officer Ricardo Rivera with the Houston Police Department was dispatched to Sarah's house on March 11, 2018. Although no one answered when he knocked on the door, Officer Rivera saw some small children come to the window and he heard an adult male and an adult female arguing inside. Sarah opened the door ten to fifteen minutes later. Officer Rivera observed that Sarah was "very frantic" and crying, and he learned that Barahona-Ramos was still in the living room.

After he detained Barahona-Ramos for officer-safety reasons, Officer Rivera spoke to Sarah, and he briefly spoke to Nancy. After speaking to Nancy, Officer Rivera determined that an allegation of sexual assault had been made against

Barahona-Ramos and he contacted the Harris County District Attorney's Office and CPS. Barahona-Ramos was arrested later that evening and charged with aggravated sexual assault of child younger than six years old.

On cross-examination, defense counsel asked Officer Rivera if Sarah had told him "she wasn't sure if [Nancy's sexual assault allegations against Barahona-Ramos] happened." Officer Rivera testified that he "believe[d] she said that." He testified:

State:      And she said that several times; isn't that true?

Rivera:    Correct.

State:      That she had doubts?

Rivera:    I don't remember that specific word, but that's possible.

## C. Detective Ernest Slaughter

Detective Ernest Slaughter was the HPD Child Sex Crimes investigator assigned to the case. When he arrived at Sarah's house, Detective Slaughter spoke to Officer Rivera, who informed him that Nancy had made an outcry of abuse to Sarah. Detective Slaughter took photographs of the home and spoke to Sarah and Barahona-Ramos. As part of his investigation, Detective Slaughter made several appointments for Sarah to take Nancy to the CAC for a forensic interview, but Sarah did not take Nancy to the CAC until November 2018.

Detective Slaughter testified that he watched a recording of Nancy's forensic interview and he felt Nancy was consistent about "what abuse had happened to her," when it happened, and where the abuse occurred. Detective Slaughter reviewed Nancy's forensic interview, a CPS report concerning this case, medical records from Nancy's sexual assault examination, and he spoke to Sarah and other witnesses in the case. Based on his review, Detective Slaughter determined that Nancy's allegations were consistent with respect to the details of Barahona-Ramos' sexual abuse across those sources. He thus concluded that Barahona-Ramos had committed the charged crime of aggravated sexual assault of a child younger than six years old.

On cross-examination, Detective Slaughter testified that he obtained two CPS reports involving Nancy. Defense counsel then asked him a series of hypothetical questions regarding the existence of inconsistencies between the CPS records and statements made during the CAC forensic interviews. Detective Slaughter conceded that if a child is asked whether "someone has touched her butt and the response in the CAC video is different from [the response] in the CPS report," this would constitute an inconsistency. And when asked, "[I]f a child is asked if someone else besides the accused has touched her foo-foo (ph) (sic) and she said no one else and that's inconsistent with the CPS report," is that an inconsistency?", Detective Slaughter stated, "If that occurred, yes." Detective Slaughter testified that he did not notice any inconsistencies in the records he reviewed in this case, but if he had "seen

17

inconsistencies like the ones [he was asked about on cross-examination he] would have done something differently."

After the State rested its case, Barahona-Ramos recalled Detective Slaughter. Detective Slaughter testified that he reviewed two CPS reports involving Nancy, both of which were "initiated on behalf of the family." One report involved Nancy's March 2018 allegations of sexual assault against Barahona-Ramos, and the other was a report from February 2017 involving Nancy and her brother Bobby. Detective Slaughter testified there were inconsistencies in Nancy's statements between the February 2017 CPS report and her November 2018 forensic interview:

> Defense: Yesterday I asked you if there was an inconsistency by the child about if someone had touched her foo-foo (ph) (sic) in the CAC video with what you saw in the CPS report. Would that be an inconsistency?
>
> Slaughter: Correct.
>
> Defense: And having reviewed the records today, did you see that that was an inconsistency?
>
> Slaughter: Correct.
>
> Defense: Now based on that inconsistency in those two reports, would you have done something different in your investigation?
>
> Slaughter: No, ma'am.

On cross-examination, the State asked Detective Slaughter if Nancy had been consistent in claiming that Barahona-Ramos had "put his fingers in her vagina," and Detective Slaughter testified that Nancy's statements were consistent on that point.

18

## D.  Nancy

Nancy, then nine years old, testified at trial. Nancy identified the parts of her body that no one should touch as her "vagina" and "butt." She testified that she lived in a house in Houston when she was five years old, and one morning, Barahona-Ramos took her to his room. She could not remember if Barahona-Ramos was wearing clothes or what she was wearing, but she remembered she was wearing clothes. According to Nancy, Barahona-Ramos told her to lay down on the bed and he then pulled her pants down. Nancy testified that she felt Barahona-Ramos' fingers in her vagina, and it felt "uncomfortable." Barahona-Ramos stopped touching Nancy when Sarah called from work. According to Nancy, she and her sisters were also on the call with Nancy. Nancy tried to tell Sarah what had happened but she "couldn't tell her because [Barahona-Ramos] was talking to her." Nancy took a shower after the call with Sarah because Barahona-Ramos told her to shower. Nancy testified she eventually told Sarah what Barahona-Ramos had done to her and afterwards, the police came to her house. According to Nancy, she felt "safer" when the police arrived because Barahona-Ramos "was going to be gone."

After the State concluded its direct examination of Nancy, Barahona-Ramos asked the court to conduct an in camera hearing pursuant to Texas Rule of Evidence

412(c).[8] During the hearing, Nancy testified that she also referred to her vagina as her "foo-foo." Nancy did not remember ever telling anyone that her brother Bobby had touched her foo-foo and her butt. According to Nancy, Bobby "never touched me." After Nancy was excused, Barahona-Ramos argued:

> Judge, the witness has testified that [Bobby], her brother, never touched her foo-foo (ph) (sic). There is evidence in the CPS records, that I will bring out in my case-in-chief, that indicates that [the witness] had stated that her brother had touched her foo-foo (ph) (sic) and there was a CPS investigation after that. The mother testified that she didn't believe the child when she made this accusation [against Barahona-Ramos] because the child had made up those allegations [against her brother], which is now confirmed by the child's own testimony. So I'm asking the Court to allow me to cross examine the child about those false allegations that she made against her brother. They are—they resemble exactly the allegation that she's making against my client. She says exactly to her mother and CPS, the year before, that [Bobby] touched her foo-foo (ph) (sic) with his fingers, and her mouth.

At the conclusion of the in camera hearing, the trial court stated:

> Court:      And what—because it's been a long conversation—what question did you want to ask [the witness] again?
>
> Defense:    I want to ask [Nancy] if she remembers or if she—when she was four, if she told her mommy that her brother, [Bobby], had touched her foo-foo (ph) (sic) and her butt, and does she remember doing that.

---

[8]  *See* TEX. R. EVID. 412(c) ("Before offering any evidence of the victim's past sexual behavior, the defendant must inform the court outside the jury's presence. The court must then conduct an in camera hearing, recorded by a court reporter, and determine whether the proposed evidence is admissible. The defendant may not refer to any evidence ruled inadmissible without first requesting and gaining the court's approval outside the jury's presence.").

. . .

Court:     . . . So I'll let you in a limited fashion—I'm sure it will be well objected upon as to your questions—but if you go too far [a]field, then we're going to have to stop. Does that make sense?

Defense:     Yes, sir.

On cross-examination, Barahona-Ramos questioned Nancy about her prior allegations against her brother Bobby:

Defense:     Okay. Let me ask you this. Do you remember going and talking to a lady in a room while you were drawing?

Nancy:     Yes.

Defense:     Okay. And do you remember if she was asking you questions?

Nancy:     Yes.

Defense:     Yeah. And do you remember her asking you questions about anyone touching your vagina?

Nancy:     Yes.

Defense:     And anyone touching your butt?

Nancy:     Yes.

Defense:     Yes?

Nancy:     (Nodding.)

Defense:     Now had anyone else—you told her about—you said [Barahona-Ramos] touched your vagina. Do you remember her asking you if anybody else had touched your vagina?

Nancy:     Yes.

21

Defense: And what was your answer?

Nancy: No.

Defense: Okay. Are you telling us today that nobody else has ever touched your vagina?

Nancy: Yes.

Defense: Now do you remember when you were four-years-old, a year before the police came to your house, that you told your mommy that [Bobby] . . . had touched your foo-foo (ph) (sic)?

. . .

Defense: Do you remember that?

Nancy: No.

Defense: You don't remember telling them that he touched your butt and your foo-foo (ph) (sic) and that he licked it?

Nancy: No.

Defense: Do you remember other people coming to your house to investigate that?

Nancy: No.

Defense: So, and you remember that you—well, let me strike that, Judge. But everything you told that lady [during the forensic interview] was the truth that day?

Nancy: Yes.

Defense: And everything you're telling us is the truth today?

Nancy: Yes.

. . .

22

Defense:    When I asked you earlier about [Bobby] touching your foo-foo (ph) (sic), did he get in trouble for doing that?

Nancy:      I don't remember. He had never touched me.

Defense:    So if you had told somebody that [Bobby] had touched your foo-foo (ph) (sic), that was a lie?

Nancy:      I don't remember saying that he touched me.

Defense:    I'm sorry?

Nancy:      I don't remember ever saying that he had touched me.

. . .

Defense:    But if somewhere it shows that . . . you had said that about [Bobby], does that mean that was a lie?

Nancy:      I don't know.

## E.    Closing

In her closing, Barahona-Ramos' counsel discussed the February 2017 CPS investigation involving Bobby, and she identified discrepancies in the evidence she argued undermined Sarah's credibility, including Sarah's alleged inconsistent testimony about her statements to Officer Rivera the night Barahona-Ramos was arrested.  Among other examples, Barahona Ramos' counsel argued:

> You know, let's talk about all [Sarah's] lies because there were so many. . . I asked her, didn't you say you had doubts that day [about Nancy's allegations]. Oh, no, no, no, I didn't want to believe it. But she kept telling Officer Rivera that she had doubts. She had doubts because of the way [Nancy] had told her, smiling and grinning. She didn't believe it because [Nancy] was smiling and grinning.

23

With respect to Nancy, defense counsel argued that Nancy had falsely accused Barahona-Ramos of sexually assaulting her because he had reported Sarah to the police the night before and she was unhappy about it. Defense counsel argued that Nancy did not expect things to "blow up" after she accused Barahona-Ramos of abuse because she had made a similar allegation against her brother, and nothing came of CPS's investigation into that claim. According to defense counsel, Nancy's "life [was] turned upside down" after she made her claims against Barahona-Ramos, and she could not "take that back." Defense counsel argued:

> And what do we know? Is that something like this may or may not have happened a year before, because CPS investigated. CPS investigated and I asked her, do you remember telling your mom that [Bobby] touched your foo-foo (ph) (sic). Nope, nobody else touched my foo-foo (ph) (sic). So CPS does this big investigation and what happens? Nothing. And you know why that's really important? Because I know one of the biggest questions that you guys will have when you go back there is to say, well, how would a five-year-old know this. And I think that's a very good question. And I think one of our venire people actually said it in voir dire. Well, a five-year-old is going to make that up. I don't even know that kind of stuff. But she knew that, because it happened or didn't happen the year before and CPS investigated it. So what happens? So dad calls the police on mom the night before. What does she do? She doesn't like that. She tells this story. Don't expect that to happen. And what happens? Her life is turned upside down. Can't take that back. So she just—when you're asked, you tell the same story. And she comes over here and she tells the same story. Every time she has to come to prepare for trial, she tells the same story. The same people come. . . . So she knows, because it's been reinforced every time.

24

The jury found Barahona-Ramos guilty of the first-degree felony offense of aggravated sexual assault of a child younger than six years old and the trial court assessed his punishment at twenty-five years' confinement.

**Limited Cross Examination of Outcry Witness**

In his sole issue on appeal, Barahona-Ramos argues the trial court erred in not allowing him to "cross-examine the outcry witness [Sarah] with evidence that she had doubts about [Nancy's] allegations because [Nancy] had made a similar complaint about [Nancy's] biological brother [Bobby] that had proven false." According to Barahona-Ramos, he should have been allowed to cross-examine Sarah on this issue and "present this important issue to the jury, so as the trier of fact, they could determine whether it was reasonable to believe [Sarah] had doubts about [Nancy's] outcry because [Nancy] was making up the same allegations against [Barahona-Ramos] as [Nancy] had made against her brother" Bobby.[9, 10]

---

[9] Barahona-Ramos does not argue on appeal that the trial court abused its discretion by limiting his cross-examination of Nancy, the complainant.

[10] Barahona-Ramos argues that, by limiting his ability to cross examine Sarah, the trial court also violated his rights under Article I, Section 10 of the Texas Constitution and Texas Code of Criminal Procedure Article 1.05. *See* TEX. CONST. art. I, § 10 (stating Texas defendants have right to confront witnesses in criminal prosecutions); TEX. CODE CRIM. PROC. art. 1.05 ("In all criminal prosecutions the accused . . . shall be confronted with the witnesses against him."). Because Barahona-Ramos does not separately brief these issues apart from his Sixth Amendment challenge, we will not consider whether the trial court's limitation on Barahona-Ramos' ability to cross examine Sarah violated his rights under the Texas Constitution and Texas Code of Criminal Procedure. *See Dewberry v. State*, 4 S.W.3d 735, 744 (Tex. Crim. App. 1999) ("[A]ppellant fails to distinguish his rights under the Texas Constitution from

The State responds the trial court properly excluded Barahona-Ramos'
proposed questioning of Sarah concerning Nancy's "prior unsubstantiated
allegations of sexual abuse against [her] brother, and whether those unsubstantiated
allegations caused Sarah to disbelieve [Nancy's] claims against Barahona-Ramos,"
because Barahona-Ramos sought to present evidence of that specific instance of
conduct for the sole purpose of attacking Nancy's credibility or character for
truthfulness in violation of Rule of Evidence 608. The State further argues that even
if the trial court abused its discretion by limiting defense counsel's examination of
Sarah, the error was harmless.

## A.    Standard of Review and Applicable Law

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all
criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the
witnesses against him . . . ." U.S. CONST. amend. VI. "[A]lthough a defendant's
right to confrontation and cross-examination is constitutionally safeguarded, it is not
absolute." *Cruz–Escalante v. State*, 491 S.W.3d 857, 860 (Tex. App.—Houston [1st
Dist.] 2016, no pet.) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986)).
While a defendant may cross-examine a witness "on any subject reasonably
calculated to attack his credibility, such as exposing a motive, bias, or interest," the

---

that of the federal constitution . . . . Therefore, we only address whether appellant's
rights under the United States Constitution were violated . . . .").

trial court has "considerable discretion in determining how and when bias may be proved, and what collateral evidence is material for that purpose." *Cruz–Escalante*, 491 S.W.3d at 860; *see also Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (holding trial court has "wide discretion in limiting the scope and extent of cross-examination") (citing *Van Arsdall*, 475 U.S. at 679).

"Generally, the right to present evidence and to cross-examine witnesses under the Sixth Amendment does not conflict with the corresponding rights under state evidentiary rules." *Hammer*, 296 S.W.3d at 561. "Thus, most questions concerning cross-examination may be resolved by looking to the Texas Rules of Evidence." *Id.* "Only if the proffered evidence is barred by all state evidentiary rules must courts turn to the federal constitution." *Id.* at 566.

In this context, Texas Rule of Evidence 608(a) states that a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." TEX. R. EVID. 608(a). But Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." *Id.* at 608(b). Thus, while evidentiary rules "permit the use of prior false accusations when offered to show the witness's specific bias or motive for testifying," including Texas Rules

of Evidence 404 and 613, Rule 608(b) prohibits such evidence when offered solely to attack a witness's character for truthfulness. *See Hammer*, 296 S.W.3d at 566; *see also* TEX. R. EVID. 404(b) (stating evidence of extraneous bad act inadmissible to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but admissible to prove motive); *id.* 608(b) (stating "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness"); *id.* 613 (allowing impeachment of witness using extrinsic evidence of alleged bias or interest under limited circumstances).

For impeachment evidence to be admissible under Rule 613, the defendant must establish a causal connection or logical relationship between the evidence and the witness' alleged bias or motive. *Johnson v. State*, 433 S.W.3d 546, 552 (Tex. Crim. App. 2014); *Crenshaw v. State*, 125 S.W.3d 651, 654 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). In other words, the defendant must establish that the proffered evidence is relevant to the existence of bias or motive. *See Johnson*, 433 S.W.3d at 552 (stating "the proffered evidence need not definitively prove the bias alleged—it need only 'make the existence' of bias 'more probable or less probable than it would be without the evidence'") (quoting TEX. R. EVID. 401).[11]

---

[11] Barahona-Ramos' appellate brief does not cite to or expressly address any Texas Rules of Evidence, including Rules 404, 608, and 613.

## B.      Briefing Waiver

Even if we conclude the trial court abused its discretion by preventing Barahona-Ramos from cross-examining Sarah about Nancy's outcry of abuse against her brother, and whether that allegation caused her to doubt Nancy's outcry against Barahona-Ramos, we cannot reverse on this basis unless Barahona-Ramos was harmed by the error. *See* TEX. R. APP. P. 44.2. All errors are subject to harmless error analysis under Texas Rule of Appellate Procedure 44.2, except for a very narrow category of errors defined by the United States Supreme Court as "structural" errors.[12] Although a defendant does not bear the burden to prove harm, he must still brief the question of harm and provide supporting arguments, substantive analysis,

---

[12]    Structural errors comprise a narrow class of cases involving the deprivation of federal constitutional rights. *See Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005) (citing *Johnson v. U.S.*, 520 U.S. 461, 468–469 (1997)); *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (stating structural error is error of constitutional magnitude that "affect[s] the framework within which a trial proceeds rather than simply an error in the trial process itself"). The United States Supreme Court has defined the following errors as structural: (1) lack of an impartial trial judge; (2) the unlawful exclusion of members of the defendant's race from a grand jury; (3) the denial of the right to self-representation at trial; (4) the denial of the right to a public trial; (5) an instruction that erroneously lowers the burden of proof for conviction below the "beyond a reasonable doubt" standard; and (6) the total deprivation of counsel. *See Johnson*, 520 U.S. at 468–69; *see also U.S. v. Davila*, 569 U.S. 597, 611 (2013) (stating structural errors constitute "highly exceptional category" of errors). The Texas Court of Criminal Appeals' plurality decision in *Lake v. State*, 532 S.W.3d 408 (Tex. Crim. App. 2017) indicates that a very narrow class of non-structural errors may also be immune to a harmless error analysis. *Id.* at 411 (citing *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) ("Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis.")).

and appropriate citations to authorities and to the record to avoid briefing waiver. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) ("Neither the State nor the defendant has a burden to prove harm."); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding defendant waived issue on appeal because he failed to address whether alleged error was harmful); *see also* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

Barahona-Ramos neither argues he was harmed because he was prevented from cross-examining Sarah about Nancy's outcry of abuse against her brother, nor does he assert that this alleged error fits one of the very narrow exceptions that are immune from the harmless error analysis. Barahona-Ramos thus waived this issue due to inadequate briefing. *See Cardenas*, 30 S.W.3d at 393; *see also Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding defendant waived issue when he did not "argue that he was harmed by" alleged error).

## C.    Abuse of Discretion

Even if Barahona-Ramos had not waived this issue, he would not prevail on appeal. After citing case law regarding the use of extrinsic evidence during cross examination to prove bias, motive, or fabrication, and discussing *Hammer v. State*, 296 S.W.3d 555 (Tex. Crim. App. 2009), Barahona argues in his appellate brief:

In accordance with the above-referenced case law, the trial court erred in not allowing Appellant to cross-examine [Sarah] with evidence that [Nancy] had made false allegations of sexual abuse in the past causing her to doubt the allegations in this case. Appellant should have been given the opportunity to present this important issue to the jury, so as the trier of fact, they could determine whether it was reasonable to believe [Sarah] had doubts about [Nancy's] outcry because [Nancy] was making up the same allegations against Appellant as she had made against her brother.

This is the entirety of Barahona-Ramos' argument. Although he suggests that evidence of Nancy's sexual assault allegations against Bobby to prove Sarah had doubts about Nancy's present outcry of abuse against Barahona-Ramos was admissible to prove bias and motive, Barahona-Ramos does not articulate in his brief a possible bias or motive or explain how the excluded cross-examination of Sarah made the existence of such a bias or motive more or less probable.

The only purported motive advanced by Barahona-Ramos at trial was advanced during closing arguments when his defense counsel suggested that Nancy lied about the sexual assault because Barahona-Ramos had asked Jack to report her mother, Sarah, to the police the night before and Nancy was unhappy about it. There are at least two problems with this. First, Barahona-Ramos did not explain to the trial court, at the time the trial court made its challenged ruling, that he was trying to establish or develop this purported motive by eliciting testimony from Sarah that Nancy had falsely accused her brother Bobby of touching her butt and "foo-foo" in the past. *See Johnson*, 433 S.W.3d at 552 (stating defendant, as proponent of

31

evidence, must establish causal connection or logical relationship between excluded evidence and witness' alleged bias or motive). Second, Barahona-Ramos complains on appeal only about the exclusion of evidence during his cross-examination of Sarah concerning her alleged doubts. He does not complain on appeal about any limitation on his examination of Nancy, where he was free to develop any theories of motive or bias, including Nancy's alleged motive to lie about the sexual assault because she was unhappy with Barahona-Ramos.

The record reflects that Barahona-Ramos did not question Nancy, or any other witness, about Nancy's supposed motive for falsely accusing him of sexual assault. The only evidence that Nancy bore any animus towards Barahona-Ramos was Sarah's testimony that Nancy said she hated Barahona-Ramos because he had touched her. Barahona-Ramos also has not directed us to, nor have we found, any evidence in the record indicating Nancy even knew that Sarah had been reported to the police for leaving the children alone, let alone that Nancy was unhappy that Sarah had been reported to the police, or that Jack reported Sarah to the police because Barahona-Ramos told him to do so.

Barahona-Ramos' offer of proof established that there was "a CPS investigation in February of 2017 regarding [Nancy] and [Bobby]," that Nancy had claimed Bobby "had touched her butt or something," that the night she reported the abuse to police Sarah questioned whether Nancy was being truthful about her

allegation that Barahona-Ramos had sexually assaulted her, and that Sarah's "doubts that night were based on the CPS investigation" in 2017 concerning Nancy's allegation of abuse against Bobby. The logical implication of Barahona-Ramos' proposed questioning of Sarah is that Nancy is not truthful and thus not a credible witness because she falsely accused her brother of sexually assaulting her in 2017, causing her own mother to doubt Nancy's claim that Barahona-Ramos had sexually assaulted her. Barahona-Ramos, however, cannot use evidence that Nancy made a false allegation of sexual assault in the past to attack Nancy's character for truthfulness. *See Hammer*, 296 S.W.3d at 563; TEX. R. EVID. 608(b) (prohibiting parties from asking about or offering "extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness").

Although such evidence may be admissible to establish motive under Rule 613(b), we can discern no causal connection or logical relationship between this evidence and Nancy's supposed motive to falsely claim that Barahona-Ramos had sexually assaulted her because she was unhappy that he had Sarah reported to the police the night before and Nancy presumably wanted to get Barahona-Ramos in trouble. *See Johnson*, 433 S.W.3d at 552–53 (stating defendant, as proponent of evidence, must establish causal connection or logical relationship between excluded evidence and witness' alleged bias or motive). Nor does the excluded evidence make

33

it more or less probable that Barahona-Ramos sexually assaulted Nancy. *See* TEX. R. EVID. 401(a); *see also Lopez v. State*, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000) ("Prior false allegations of abuse 'do not tend to prove or disprove any of the elements of rape.'") (quoting *State v. Boggs*, 588 N.E.2d 813, 816–17 (Ohio 1992)); *Solis v. State*, No. 13-14-00633-CR, 2016 WL 872677, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 18, 2016, no pet.) (mem. op., not designated for publication) ("But S.G.'s past allegation of rape, true or false, does not tend to prove her motive or bias in this case. The fact that S.G. previously made an allegedly false accusation of rape against another individual does not tend to prove her motive to falsely accuse Solis of sexual assault in the present case.").

Barahona-Ramos' reliance on *Hammer* is misplaced. In *Hammer*, the defendant's daughter P.H. accused him of rubbing her vagina. The defendant's defensive theory was that "P.H. made up a tale of sexual molestation to get out from under the heavy hand of" the defendant and the defendant "was allowed to question P.H. generally about her motive to falsely accuse him." *See Hammer*, 296 S.W.3d at 566. The evidence before the jury established that P.H. did not like the defendant because he "disciplined her too much," and he "wouldn't let her do whatever she wanted to, as she could when she lived with her mother." *Id.* "The jury was aware of P.H.'s motive to make a false accusation that would send [the defendant] back to prison." *Id.* The trial court excluded evidence that P.H. had been "particularly angry

34

with [the defendant] when he took her to the hospital for a sexual assault examination after she had run away from home and stayed out overnight," that P.H. told the nurse she had been sexually assaulted by someone named Ignacio the night she ran away, and that P.H. later told a family friend that she had had sex with her boyfriend Anthony that night, not Ignacio, but she "said that it was Ignacio because her father was really strict about letting her see Anthony." *Id.* at 567.

The Court of Criminal Appeals held that the trial court abused its discretion by excluding this evidence because it was admissible to "prove P.H.'s bias against [the defendant] and to show her purported motive in falsely accusing him." In doing so, the Court of Criminal Appeals observed:

> This evidence is strong support for [the defendant's] theory that P.H. had a motive to falsely accuse him of sexual molestation. It also demonstrates that P.H. was not above changing her story of a consensual sexual encounter with her boyfriend into a nonconsensual one with someone else to prevent her father from learning the truth and presumably punishing her for running away and having sex with Anthony.

*Id.* Although Barahona-Ramos' counsel used the operative words "bias" and "motive," unlike in *Hammer*, Barahona-Ramos did not identify Nancy's supposed motive for falsely accusing him of sexual assault when he cross-examined Sarah, nor did he question Nancy about the motive he identified in his closing argument.

Because Barahona-Ramos has not shown that the excluded evidence about which he complains served any purpose other than to attack Nancy's general

35

reputation for truthfulness, which is prohibited by Texas Rule of Evidence 404 and 608, we cannot say the trial court's limitation on his cross-examination of Sarah was an abuse of discretion. *See Pierson v. State*, 426 S.W.3d 763, 772 (Tex. Crim. App. 2014) (holding trial court did not abuse its discretion in excluding cross-examination concerning child victim's prior false allegation of sexual abuse because defendant failed "to show that the question was anything more than a prelude to impeachment on a collateral matter and an impermissible attempt to attack the complaining witness's general credibility with evidence of specific instances of conduct") (citing TEX. R. EVID. 608(b)); *see also* TEX. R. EVID. 404(b) (stating evidence of extraneous bad act inadmissible to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but admissible to prove motive).

## D.     Harmless Error

Even if the trial court had abused its discretion by excluding cross-examination of Sarah concerning evidence that Nancy "had made false allegations of sexual abuse in the past causing [Sarah] to doubt the allegations in this case," the error was harmless because Barahona-Ramos was able to introduce similar evidence elsewhere at trial.

Generally, a trial court's error in admitting or excluding evidence is non-constitutional error, which we review under Texas Rule of Appellate Procedure

36

44.2(b). *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). Rule 44.2(b) provides that any "error, defect, irregularity, or variance" that does not affect a defendant's "substantial rights" must be disregarded.[13] TEX. R. APP. P. 44.2(b); *see also Hammer*, 296 S.W.3d at 570 (instructing lower court to evaluate error in excluding evidence "under Rule 44.2(b)"); *Billodeau v. State*, 277 S.W.3d 34, 43 (Tex. Crim. App. 2009) (holding trial court abused its discretion by not allowing defendant to cross-examine complainant regarding his threats to falsely accuse neighbors of sexual molestation in order to show complainant's possible motive for accusing defendant of sexual molestation and analyzing error under Rule 44.2(b)). Substantial rights are affected when the error has a "substantial and injurious effect or influence" on the jury's verdict. *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023). The improper exclusion of evidence is not reversible if the same or similar evidence is admitted at trial without objection. *See Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. 1981) ("This court has consistently held reversal is not required by exclusion of evidence where the same testimony was later admitted without objection." (internal citations omitted)); *see also Mitchell v. State*, No. 07-22-00359-CR, 2023 WL 4635054 at \*4 (Tex. App.—Amarillo July 19, 2023, pet. ref'd) (mem. op., not designated for publication) ("The standard for the exclusion of

---

[13]    "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

37

cumulative evidence and harmless error dictates that no harm results when evidence is excluded if other similar evidence is admitted.") (citing *Womble*, 618 S.W.2d at 62).

The erroneous exclusion of evidence, however, constitutes constitutional error if the excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Walters*, 247 S.W.3d at 219 (citing *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)). In such a situation, the defendant's Sixth Amendment right to confront witnesses may be violated. *See Johnson* 433 S.W.3d at 551 ("Rather, '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination[,]' because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'") (quoting *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)).

The test to determine the scope of cross-examination demanded by the Confrontation Clause is whether the defendant could present a vital defense theory without the evidence, not whether the defensive theory is as strong as it could be with the evidence. *See id.* at 557 ("[A] 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment."). "Only when the trial court's limitation on cross-examination sweeps so broadly as to render the

examination wholly ineffective can it be said that the trial court commits an error of constitutional dimension." *Id.*

Detective Slaughter testified that he reviewed two CPS reports during his investigation, both of which involved allegations of sexual assault made by Nancy. One report addressed Nancy's allegation of sexual assault against Barahona-Ramos in March 2018, and the other concerned a February 2017 report "regarding [Nancy] and her brother [Bobby]." Nancy, who was five years old in March 2018, was questioned about the February 2017 report. She testified that she did not remember telling anyone when she was four years old that Bobby had touched her butt and "foo-foo." When asked if Bobby had gotten in trouble for touching her butt and "foo-foo," Nancy testified, "I don't remember. He had never touched me."

Defense counsel was also able to ask Sarah some questions about Nancy's prior allegations of abuse against her brother Bobby and any alleged doubts she had about Nancy's allegations of sexual abuse against Barahona-Ramos. While she did not recall using the word "doubt," Sarah testified that she told the officers investigating Nancy's allegations against Barahona-Ramos that she was not "sure if this happened."

Although Sarah did not testify that she doubted Nancy's allegations against Barahona-Ramos because Nancy had previously made an outcry of sexual abuse against her brother Bobby, Barahona-Ramos was able to elicit testimony that Nancy

39

had accused Bobby of sexually assaulting her by touching her butt and "foo-foo," and that the allegation was purportedly false because, as Nancy testified at trial, Bobby "never touched" her. Sarah also testified that she had questioned whether Nancy was being truthful when she claimed that Barahona-Ramos had sexually assaulted her. And Barahona-Ramos was able to elicit other arguably conflicting or inconsistent testimony from Sarah regarding her statements to Officer Rivera and the prosecution, which he used during his closing argument to argue that Sarah was not a credible witness. In his closing, Barahona-Ramos argued that Nancy falsely accused him of sexually assaulting her because he had Sarah reported to the police for child abandonment the night before and Nancy was unhappy about it.

Because Barahona-Ramos was able to present his fabrication defense to the jury, the trial court's exclusion of evidence during Sarah's cross-examination constitutes non-constitutional error. *See Potier*, 68 S.W.3d at 665 (stating "the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense"); TEX. R. APP. P. 44.2(b) (stating non-constitutional error is any "error, defect, irregularity, or variance" that does not constitute constitutional error). We further conclude that Barahona-Ramos was not harmed by the exclusion of this evidence because he was able to introduce similar evidence elsewhere at trial. Barahona-Ramos introduced evidence that Nancy had

accused her brother Bobby in February 2017 of touching her butt and "foo-foo," that CPS had investigated the allegations and nothing had come from them, and that in light of Nancy's prior allegations, Sarah questioned whether Nancy was being truthful when she accused Barahona-Ramos of sexually assaulting her in the same manner. Barahona-Ramos was also able to question Nancy about the 2017 allegations, and he elicited testimony from Nancy stating Bobby had not toucher her. *See Womble*, 618 S.W.2d at 62 (stating erroneous exclusion of evidence not harmful if same evidence admitted elsewhere without objection).

In light of this testimony, we cannot say that Barahona-Ramos' inability to cross-examine Sarah with evidence that Nancy "had made false allegations of sexual abuse in the past causing [Sarah] to doubt the allegations in this case," had a "substantial and injurious effect or influence" on the jury's guilty verdict. *Cook*, 665 S.W.3d at 599 (stating non-constitutional error under Rule 44.2(b) is harmful if it has "substantial and injurious effect or influence" on jury's verdict).

We overrule Barahona-Ramos' sole issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

41

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).